ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br>v.<br><br>**ZULMA IVELISSE MORALES SIERRA**<br><br>Apelante | KLAN202400797 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Caguas**<br><br>Civil Núm.:<br>E EC2023G0009<br>E EC2023G0011<br><br>Sobre: Art. 127-A CP |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

### SENTENCIA

En San Juan, Puerto Rico, a 9 de mayo de 2025.

Comparece ante nosotros, mediante recurso de apelación, Zulma Ivelisse Morales Sierra (en adelante "apelante" o "Morales Sierra"). Solicita la revocación de una sentencia de culpabilidad por dos cargos de negligencia en el cuidado de personas de edad avanzada e incapacitadas, Artículo 127 del Código Penal, 33 LPRA sec. 5186.

Examinados los escritos presentados, así como la transcripción estipulada de la prueba oral y el derecho aplicable, acordamos confirmar la *Sentencia* apelada.

### I.

Surge del expediente ante nuestra consideración que, por hechos ocurridos entre el 11 de septiembre de 2020 y el 16 de abril de 2021, el Ministerio Público presentó tres acusaciones contra Zulma Ivelisse Morales Sierra, una por infracción al Artículo 127-A del Código Penal de Puerto Rico y otras dos por infracciones al Artículo 127 del Código Penal. En específico, las acusaciones por infracciones al Artículo 127 y al Artículo 127-A del Código Penal de Puerto Rico leen como sigue:

La referida imputada ZULMA I. MORALES SIERRA, allá en o para el periodo que comprende desde el 11 de septiembre de 2020 hasta el 16 de abril de 2021, en Aguas Buenas, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Caguas; fungiendo como dueña y operadora del Hogar Huellas Corporation, obrando con negligencia y teniendo la obligación que le impone la ley de prestar alimentos y cuidados a una persona de edad avanzada o incapacitada, no observó el cuidado debido para con la adulta con impedimento con perlesía cerebral Kimayra Cintrón Rubert, poniendo en peligro la vida, salud, integridad física. Actos consistentes en que obrando de manera negligente y sin estar autorizada a brindar servicios a adultos con impedimentos, desviándose de las normas del estándar de cuidado dejó desprovista de servicios de salud, así como la desviación de servicios clínicos de la adulta con impedimento con perlesía cerebral Kimayra Cintrón Rubert, poniendo en peligro la vida, salud e integridad física de esta. Hechos contrarios a la Ley.

La referida imputada ZULMA I. MORALES SIERRA, allá en o para el periodo que comprende desde el 11 de septiembre de 2020 hasta el 16 de abril de 2021, en Aguas Buenas, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Caguas; fungiendo como dueña y operadora del Hogar Huellas Corporation, obrando con negligencia y teniendo la obligación que le impone la ley de prestar alimentos y cuidados a una persona de edad avanzada o incapacitada, no observó el cuidado debido para con la adulta con impedimento con perlesía cerebral Maribel Cintrón Rubert, poniendo en peligro la vida, salud, integridad física. Actos consistentes en que obrando de manera negligente y sin estar autorizada a brindar servicios a adultos con impedimentos, desviándose de las normas del estándar de cuidado dejó desprovista de servicios de salud, así como la desviación de servicios clínicos de la adulta con impedimento con perlesía cerebral Maribel Cintrón Rubert, poniendo en peligro la vida, salud e integridad física de esta. Hechos contrarios a la Ley.

La referida imputada ZULMA I MORALES SIERRA, para la fecha del 11 de septiembre de 2020 al 16 de abril de 2021 y en Aguas Buenas, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Caguas, ilegal, voluntaria, intencional, y criminalmente, fungiendo como dueña y operadora de Hogar Huellas Corporation realizó actos de maltrato hacia la persona de edad avanzada José Cintrón Torres y Josefina Rubert Torres, cuando mediante falsa pretensión y engaño logró el ingreso de sus hijas adultas con impedimento Kimayra y Maribel, ambas con apellidos Cintrón Rubert, al hogar Huellas Corporation y en su consecuencia cometió abuso financiero, abuso emocional, apropiación ilegal, fraude causándole daño o exponiéndole al riesgo de sufrir daño a su salud, bienestar o sus bienes. Hecho contrario a la ley.

Luego de varios trámites procesales, el 24 de octubre de 2023 dio comienzo el juicio en contra de Morales Sierra, el cual se extendió por un término de trece (13) días.

La prueba presentada por el Ministerio Público durante el juicio consistió en la presentación de prueba testifical, a través del testimonio de veintiséis (26) testigos y diversa prueba documental. Para un mejor entendimiento de los eventos suscitados ante el foro primario, procedemos a realizar un resumen de algunos de los testimonios vertidos.[1]

Sra. Vanessa Marie Peña Hernández

La señora Peña Hernández, quien fungía como facturadora de servicios de ambulancia y coordinadora de servicios para la empresa *International Medical Transport*, declaró que fue quien certificó la hoja de servicios de ambulancia del 19 de abril de 2021 de la paciente Maribel Cintrón Rubert. Explicó que en dicho documento el paramédico que atiende el caso escribe todo lo relacionado al momento en que atiende al paciente, como lo es el estado físico y los signos vitales. A preguntas del abogado de defensa, la señora Peña Hernández respondió que de la narrativa del documento no se desprendía que la paciente tuviese un moretón en la cara.[2]

Sr. Derek Medina Santos

El señor Medina Santos, paramédico de la empresa *International Medical Transport*, relató que el 19 de abril 2021 atendió una llamada de emergencia, inicialmente, por un incidente por dificultad respiratoria. Narró que al personarse en la ubicación que le fue indicada tuvo contacto familiar con el padre de la paciente, quien le informó que esta presentaba debilidad general, dificultad al respirar y úlceras en ambos glúteos. Detalló que

---

[1] El Ministerio Público también contó con el testimonio de los siguientes testigos: Sra. Juana Nieves; Sra. Tanya Pérez Gutiérrez; Sra. Ana Aparicio Barrios; Sr. Federico García; Sra. Daphne Arias Salcedo.
[2] Transcripción de la Prueba Oral (TPO) del 24 de octubre de 2023, págs. 68, 69, 73, 77-78, 88.

observó que la paciente se encontraba en posición fetal, sin poder moverse por sí sola y que su aspecto físico denotaba que se encontraba bajo peso y con aparentes signos de deshidratación. A su vez, expresó que no recordaba si la paciente tenía un moretón en la cara.[3]

### Sr. Javier Vega Crespo

Atestó que era el gerente interino del Programa Medicaid en la Unidad de Programa de Integridad. Explicó que dicha unidad se especializaba en asuntos de fraude, abuso, desperdicio y pagos inapropiados a aquellos proveedores que brindan servicios a la población Medicaid. Expuso que recibió una solicitud, por conducto de la Agte. Loraine Hernández, de la unidad *Medicaid Fraud Control Unit*, la cual está adscrita al Departamento de Justicia, en la cual se le solicitó que validara en el sistema si las hermanas Cintrón Rubert, Kimayra y Maribel, pertenecían al Programa de Medicaid.[4]

El señor Vega Crespo afirmó que, tras realizar la búsqueda, comprobó que ambas eran beneficiarias del programa de Medicaid y de la parte "A" de Medicare. Explicó los beneficios que estaban cobijados bajo dichas cubiertas y detalló que, en los casos en que el beneficiario se encuentra encamado en un hogar sustituto y no puede solicitar los servicios médicos por sí mismo, la responsabilidad de solicitarlos recae en el dueño del hogar. Además, expresó que una vez la persona llega a un hogar, es el encargado del hogar quien adviene automáticamente cuidador del paciente y responsable de solicitar cualquier servicio médico.[5]

### Sr. Francisco José Martínez Calderón

Declaró que se desempeñaba como Analista Legal para Oriental Bank y que fue quien recibió el requerimiento de

---

[3] TPO del 24 de octubre de 2023, págs. 89, 95-99, 114, 125.
[4] Transcripción de la Prueba Oral (TPO) del 1 de noviembre de 2023, págs. 144-148.
[5] TPO del 1 de noviembre de 2023, págs. 149-153, 158-159, 161, 168, 175.

información diligenciado por la Agte. Loraine Hernández. Manifestó que por medio de dicho *subpoena* se solicitó una certificación de cuenta e información sobre la cuenta del Sr. José Cintrón Torres. Describió que la información que le fue entregada a la agente contenía la certificación de la cuenta del señor Cintrón Torres y varias copias certificadas de cheques que fueron expedidos a favor de Hogar Huellas.[6]

### Sr. Manuel Edgardo De León Rosa

Testificó que trabajaba como Director de Recursos Humanos y Oficial de Privacidad para Condado Home Care, empresa que se dedicaba a brindar servicios de salud en el hogar y entre los cuales se encontraba la curación de úlceras. Explicó que entre sus funciones como Oficial de Privacidad se encontraba custodiar los expedientes clínicos de los pacientes que reciben servicios a través de la empresa y evaluar los procesos de divulgación de información. Declaró que, en cumplimiento con un requerimiento de información, entregó a la Agte. Loraine Hernández copia de dos expedientes pertenecientes a la paciente Maribel Cintrón Rubert. Aclaró que se entregaron dos expedientes puesto que la paciente fue admitida a recibir servicios de la empresa en dos ocasiones distintas. A saber, durante los meses de mayo a julio y de julio a agosto de 2021.[7]

### Sr. Rubén Falcón Villanueva

Relató que el 11 de septiembre de 2020 acompañó a su cuñado, el Sr. José Cintrón Torres, a llevar a sus sobrinas Kimayra y Maribel Cintrón Rubert al hogar. Describió que en ese momento ambas lucían en buenas condiciones, arregladas y peinadas. Expuso que el 16 de abril de 2021 acompañó a su cuñado al hogar para buscar a "las niñas". Asimismo, detalló las condiciones en las que vio a sus sobrinas. Sobre el aspecto de Kimayra expresó que

---

[6] TPO del 1 de noviembre de 2023, págs. 176-177, 179, 181-186.
[7] TPO del 1 de noviembre de 2023, págs. 188-191.

esta lucía "demacrada", con las piernas "medio encorvadas" y que por la condición en que se encontraba pensó que esta "no pasaba de un día". A su vez, declaró que las condiciones en que se encontraba Maribel eran indescriptibles puesto que estaba "trancada" y además testificó que, cuando su hermana le quitó el pamper, pudo observar "dos rotos".[8]

Sra. Yelitza Santiago

La señora Santiago, quien se desempeñó como Trabajadora Social de la Unidad Especializada de Maltrato Institucional y Directora de la Oficina de Licenciamiento del Departamento de la Familia, Administración de Familia y Niños, testificó sobre el proceso para otorgar dispensas. Detalló que el propósito de las dispensas, en términos de licenciamiento, es otorgar o denegar una solicitud de ubicación en un establecimiento conforme a los criterios de la Ley 94 o el Reglamento 7349. Declaró además que su función en el referido proceso era evaluar el expediente y realizar una recomendación a la Secretaria del Departamento de la Familia, quien es la persona encargada de autorizar la dispensa. Explicó que como parte de su evaluación tomaba en consideración la condición de salud de la persona a favor de quien sería expedida y si el establecimiento hacia donde se estaba solicitando la dispensa tenía la capacidad de cubrir las necesidades de esta. [9]

Respondió que, a solicitud de la Agte. Loraine Hernández, mediante *subpoena*, realizó una búsqueda en el control de dispensas de la Oficina de Licenciamiento y en el correo electrónico, dirigida a determinar si existía algún registro de solicitud o de dispensa otorgada a favor de las hermanas Kimayra y Maribel Cintrón Rubert para ser ubicadas en el Hogar Huellas. Manifestó

---

[8] Transcripción de la Prueba Oral (TPO) del 6 de noviembre de 2023, págs. 200-207.
[9] TPO del 6 de noviembre de 2023, págs. 227-228.

que la búsqueda no arrojo ningún resultado a favor de las hermanas pues solo constaba registro a favor de un caballero. Declaró que plasmó dicha información en una certificación que le fue entregada posteriormente a la agente. Asimismo, puntualizó que el Hogar Huellas solo tenía autorización para ofrecer servicios de cuidado a adultos mayores de sesenta años que no padecieran enfermedades de salud mental y que tampoco podían ofrecer servicios a una población menor sin que mediara una dispensa. Por lo que, tras no existir registro de que se hubiese otorgado alguna dispensa, el referido establecimiento no estaba autorizado a recibir a las hermanas.[10]

De otra parte, aclaró que no tenía certeza de si hubo una solicitud de dispensa a favor de Kimayra y Maribel puesto que estas no llegaban directamente a su correo electrónico, ya que eran filtradas por otros funcionarios.[11]

Sra. Miriam Maysonet Arzuaga

Testificó que se desempeñaba como trabajadora social en la Unidad de Maltrato Institucional del Departamento de la Familia y que, como parte de sus tareas dentro de la unidad, fue la encargada de llevar a cabo la investigación del referido realizado por el Sr. José Cintrón Torres el 21 de abril 2021. Explicó que para atender el referido de negligencia médica entrevistó al médico que atendió a las adultas, evaluó los expedientes médicos y se reunió con la operadora de la institución Huellas, Zulma I. Morales Sierra. Expresó que Morales Sierra le entregó varios documentos, entre los que se encontraba una carta solicitando dispensa al Departamento de la Familia, el registro de medicamentos y la copia de las pruebas de

---

[10] TPO del 6 de noviembre de 2023, págs. 229-230, 232-233.
[11] TPO del 6 de noviembre de 2023, págs. 229-230, 260-261.

laboratorio ordenadas por el médico del hogar, el Dr. Efrén Martínez.[12]

La testigo añadió que visitó el hogar de los padres de ambas hermanas y que también entrevistó a la supervisora de licenciamiento, la Sra. María Merced Mateo, con relación a la solicitud de dispensa. Sobre este particular declaró que la señora Merced Mateo le expresó que hasta ese momento no había recibido solicitud de dispensa por lo que el hogar no estaba autorizado para recibir a las hermanas. Asimismo, la señora Maysonet Arzuaga manifestó que solicitó la evaluación que le fue efectuada a Maribel Cintrón Torres en la sala de emergencia del Hospital Regional de Bayamón y que, de esta surgió que la paciente tenía una úlcera y desnutrición[13]

### Sr. Joaquín Cintrón Torres

Expresó que fue invitado el 21 de mayo de 2021 a la casa de su hermano y esposa para recortarle el cabello a sus sobrinas, Kimayra y Maribel, porque estaban muy enredados y sin vida por falta de mantenimiento y, declaró recordar que en el pasado lo tenían largo y bonito.[14]

### Sr. José I. Cintrón Torres

El señor Cintrón Torres, padre de Kimayra y Maribel, manifestó que buscó un hogar que le diera servicios de cuidado, alimento y cariño a ambas hermanas, con el propósito de que estas estuviesen bien, en lo que operaban a su esposa de cáncer y se recuperaba. A esos efectos, relató que se reunió en su residencia con Morales Sierra el 11 de septiembre de 2020 para conocer los servicios que esta ofrecía. Expresó que previo al ingreso en el hogar, Kimayra y Maribel eran muchachas contentas y saludables. Detalló

---

[12] Transcripción de la Prueba Oral (TPO) del 7 de noviembre de 2023, págs.270-276.
[13] TPO del 7 de noviembre de 2023, págs. 284-287.
[14] TPO del 7 de noviembre de 2023, págs. 319-321.

que por la situación del COVID-19 no pudo ver a sus hijas hasta el 1ro de abril de 2021 y que, fue en esa ocasión que tomó la decisión junto a su esposa de sacarlas de dicho lugar. Explicó que esto se debió a que observó que ambas lucían desmejoradas y más delgadas mientras se quejaban y lloraban. Detalló que el 16 de abril de 2021, cuando fueron a buscarlas, observó que Kimayra había rebajado y no podía sentarse mientras que Maribel "era una tabla". Asimismo, atestó que una vez llegaron al hogar se percataron que Maribel tenía "dos rotos en cada caderita [y] unas úlceras profundas", la boca sucia y que se le marcaban las costillas. El testigo también explicó que Morales Sierra no se comunicó en ningún momento con él para indicarle sobre algún incidente o problema relacionado a la salud de sus hijas o sobre los servicios médicos que se le estaban brindando.[15]

Sra. Awilda Camacho Rosado

Testificó que se desempeñaba como enfermera visitante para Condado Home Care y que, siendo especialista en herida y piel, su función era evaluar los pacientes y atender aquellos casos más delicados. Estableció que conocía a Maribel Cintrón Rubert porque esta fue su paciente y narró el momento en que le hizo la visita de evaluación el 14 de mayo de 2021. Describió que en la cabeza no había espacio para meter sus dedos porque tenía nudos y costra, al igual que tenía costra en el área de la boca, que su físico era todo hueso y que al evaluar el área del glúteo derecho encontró una úlcera de estadío cuatro con hueso expuesto que debía tener más de dos meses.[16]

Manifestó que Maribel requirió servicios interdisciplinarios en la residencia, entre los cuales se encontraba asistencia de baño,

---

[15] Transcripción de la Prueba Oral (TPO) del 14 de noviembre de 2023, págs. 354, 364-371, 382-383, 389.
[16] Transcripción de la Prueba Oral (TPO) del 17 de noviembre de 2023, págs. 434, 436, 439.

trabajador social y terapia física. Expuso que, al terminar los servicios de Condado Home Care, luego de tres meses, la lesión cerró totalmente y que, Maribel se veía más alegre, con más peso, su cabello estaba bien y bajo su condición era una paciente estable.[17]

### Sra. Janet Rivera Concepción

Fue la trabajadora social y planificadora de alta del Hospital Regional de Bayamón encargada de atender el caso de Maribel Cintrón Rubert. Expresó que el 22 y 23 de abril de 2021, los padres de las mujeres le informaron que esta provenía de un hogar del cual tuvo que ser sacada y le explicaron la situación. Además, contestó que no sabía que antes de Maribel ser ingresada en el hospital había estado en su casa por varios días.[18]

### Sra. Isabel Flores Cruz

Atestó que fue la cuidadora de las hermanas Maribel y Kimayra desde el mes de mayo de 2021 hasta diciembre del mismo año. Describió las condiciones en que estas se encontraban cuando comenzó a cuidarlas, expresando que la situación era deprimente. Aseveró además sentirse satisfecha con su labor luego de haber notado un cambio positivo en ambas.[19]

### Sra. Nancy Otero Abreu

Testificó que ocupaba el puesto de Administradora de Sistema de la Unidad de Licenciamiento del Departamento de la Familia y que su función era mantener el control de las dispensas. Afirmó que durante el período de enero a diciembre de 2020 no se expidieron dispensas a favor de Maribel y Kimayra Cintrón Rubert para ser ubicadas en el Hogar Huellas.[20]

---

[17] TPO del 17 de noviembre de 2023, págs. 444, 449, 45, 456.
[18] TPO del 17 de noviembre de 2023, págs. 490-493, 511-513.
[19] TPO del 17 de noviembre de 2023, págs. 523-525.
[20] Transcripción de la Prueba Oral (TPO) del 2 de febrero de 2024, págs.582, 587.

Sra. María A. Merced Mateo

La señora Merced Mateo, quien laboraba como Supervisora del área de Licenciamiento, explicó el proceso para solicitar una dispensa y manifestó que la dispensa es sumamente importante para el operador del hogar porque de no contar con ella, no puede tener en su matrícula a una persona menor de sesenta años. Respondió además que el Hogar Huellas no tenía una dispensa.[21]

Sra. Alexandra Rivera Romero

Declaró que, como parte de sus funciones para la Unidad de Detección de Fraude de Medicaid, trabajó una investigación sobre las reclamaciones médicas y de farmacia sometidas durante el período de enero de 2020 hasta agosto de 2021 al proveedor de la cubierta médica de Kimayra y Maribel. Sostuvo que la investigación tuvo el propósito de realizar una comparativa de los servicios médicos ofrecidos a ambas hermanas antes, durante y luego del egreso del hogar. Manifestó que, en base a su investigación, en el caso de Maribel, concluyó que, se le administraron unos fármacos durante su tiempo en el hogar que ni antes ni luego de ese período utilizó. Además, expuso que, durante el período que Kimayra permaneció en el hogar sustituto no recibió atención de médicos primarios o especialistas. [22]

La testigo aclaró que como parte de su investigación no obtuvo el historial de medicamentos completo de ambas hermanas, sino que se limitó a un período cercano a su tiempo en el hogar. Expresó también que, en cuanto a los fármacos administrados y las pruebas de laboratorio que les fueron realizadas a las mujeres, su investigación fue meramente basada en un análisis técnico de interpretación de datos. De forma que no podía concluir si la

---

[21] TPO del 2 de febrero de 2024, págs. 607, 610-626.
[22] TPO del 2 de febrero de 2024, págs. 633, 639-640, 649-650.

administración de dichos medicamentos se apartaba de los resultados obtenidos en las pruebas de laboratorio.[23]

Dr. Elfrén Martínez Lorenzo

Testificó que fue el médico que ordenó laboratorios y realizó certificaciones médicas a las hermanas luego de que Morales Sierra solicitara sus servicios. Declaró que no evaluó físicamente a las mujeres, sino que fue la apelante quien le brindó la información médica sobre ambas. Expresó que, en base a su criterio profesional como médico, su opinión con relación al desempeño profesional de Morales Sierra era que esta era una buena enfermera y hacía bien su trabajo por lo que confiaba en su palabra.[24]

Sra. Josefina Rubert Torres

La señora Rubert Torres, madre de Kimayra y Maribel, manifestó que, al 11 de septiembre de 2020, la salud de estas era buena y que ninguna tomaba medicamentos. Relató que en la visita que ella y su esposo realizaron a sus hijas el 1ro de abril de 2020, pudo observar que no se encontraban bien y que lucían incómodas. La testigo expresó también que, tras observar el estado en que se encontraban, su esposo y ella tomaron la decisión de removerlas del hogar. A su vez, narró que el día que estas regresaron a su residencia lucían hambrientas y que, luego de darles comida, cuando fue a cambiarle el pañal a Maribel, se percató que esta tenía "un boquete bien hondo [y] bien grande" en el área del glúteo. Aseveró que en comparación con el momento en que estas ingresaron al hogar, las adultas a su salida se encontraban tristes, más delgadas y tullidas.[25]

De otra parte, la señora Rubert Torres aceptó que pese a las condiciones de salud de estas ninguna tenía un médico de cabecera

---

[23] TPO del 2 de febrero de 2024, págs. 656, 662-667.
[24] TPO del 2 de febrero de 2024, págs. 681-685, 687.
[25] Transcripción de la Prueba Oral (TPO) del 7 de febrero de 2024, págs. 708, 712-714, 719, 722.

que las revisara cada determinado tiempo o un terapista físico o fisiatra que las ayudara con la situación de movilidad. Asimismo, respondió que luego de haber observado que Maribel Rubert tenía una úlcera no hizo gestión alguna inmediatamente con un médico. Además, admitió que nunca le hizo reclamación alguna a Morales Sierra sobre la condición de salud en la que alegó vio a sus hijas luego de la visita al hogar.[26]

Dra. Mary Carmen Quiles Santana

Testificó que fue residente de medicina interna en el Hospital Regional de Bayamón, por lo que atendió a Maribel Cintrón el 20, 22 y 29 de abril de 2021. Describió la condición clínica de la paciente como con fiebre, desnutrida, anquilosada y severamente deshidratada. Aseguró que, dada la severidad de la infección de Maribel, de no ser porque fue ingresada en el hospital, hubiese muerto dentro de uno o dos días. De otra parte, aseveró que no podía adjudicarle la falta de movimiento de Maribel al hogar puesto que no tuvo acceso a su historial médico completo.[27]

Dra. Nilka Vázquez López

Atestó haber ofrecido servicios médicos a Maribel y Kimayra en su hogar el 9 de junio de 2021 y haber realizado una certificación médica de cada una. En específico, declaró que el diagnóstico de Maribel era perlesía cerebral con espectro autista, anquilosis, hipotiroidismo, anemia, ansiedad, retardo mental e incontinencia urinaria y fecal. A su vez, sobre Kimayra detalló que presentaba perlesía cerebral, ansiedad, insomnio, anquilosis e incontinencia urinaria y fecal. Expresó que según su historial clínico ambas hermanas no presentaban convulsiones ni epilepsia. Empero, aclaró que fuera de los resultados de laboratorio, realizó recomendaciones

---

[26] TPO del 7 de febrero de 2024, págs. 732-737, 759,762-763, 783-784.
[27] Transcripción de la Prueba Oral (TPO) del 27 de febrero de 2024, págs. 800-806, 808, 830.

descansando exclusivamente en la información que le fue brindada por los padres de Kimayra y Maribel.[28]

Agte. Loraine Hernández Rodríguez

Manifestó que se desempeñaba como agente investigadora para la Unidad de Control de Fraude al Medicaid del Departamento de Justicia y que, como parte de sus labores, el 17 de mayo de 2021, se le asignó investigar el caso de posible abuso y negligencia hacia Maribel y Kimayra Cintrón Rubert mientras estuvieron en el Hogar Huellas Corp. Expuso que de los documentos suministrados por el hogar se desprendió que Maribel Cintrón Rubert comenzó un tratamiento médico sin que esto le hubiese sido notificado previamente a sus padres. Indicó además que, a raíz de su investigación, determinó que hubo negligencia en la prestación de los servicios de cuidado, como lo era el baño y la alimentación, y en los cuidados médicos, de forma que ello provocó que el bienestar de ambas se viera afectado.[29]

De otra parte, a preguntas del abogado de defensa, la testigo respondió que de su investigación surgió que las hermanas, previo a su tiempo en el hogar, no tomaban medicamentos para sus condiciones y tampoco tenían médico primario. Además, expresó que no le llamó la atención que del expediente del hogar surgiera que Maribel llegó a este con hematomas y, en consecuencia, declaró que no indagó con los padres sobre tal asunto. A su vez, aseveró que de su investigación no surgió una determinación en cuanto a si la úlcera de Maribel ocurrió en el hogar sustituto o si fue producto del tiempo hospitalizada.[30]

---

[28] TPO del 27 de febrero de 2024, págs. 834, 845, 849-853, 865.
[29] Transcripción de la Prueba Oral (TPO) del 11 de marzo de 2024, págs. 876-877, 913, 918.
[30] TPO del 11 de marzo de 2024, págs. 932, 935-936, 943

De otra parte, la defensa de Morales Sierra contó con la presentación de prueba testifical, a través del testimonio de un (1) perito. A continuación, realizamos un resumen de este.

Dr. Ángel Manuel Dávila Franco

El perito declaró que los pacientes de perlesía cerebral deben tener un seguimiento médico puesto que son más propensos a sufrir infecciones de orina, úlceras y convulsiones. Opinó que tras examinar los expedientes del Hogar Huellas concluyó que las atenciones médicas brindadas a las hermanas fueron excelentes. A su vez, aseveró que el tratamiento farmacológico recomendado a Maribel por el doctor que la atendió en el hogar fue efectivo y no se apartó de lo que se le debía haber recetado.[31]

El testigo aceptó que hay pacientes de perlesía cerebral que dentro de su condición son saludables y no toman medicamentos. Asimismo, reconoció que la opinión que brindó ante el tribunal se basó únicamente en el expediente de la hospitalización de Maribel Cintrón Rubert en el Hospital Regional de Bayamón y en la información suplida en el expediente del Hogar Huellas. Además, manifestó que, en el caso de Maribel, todas las condiciones que presentaba eran unas que podía presentar cualquier persona encamada.[32]

Examinada la prueba desfilada ante sí y escuchadas las argumentaciones de las partes, el juzgador de instancia declaró culpable a Morales Sierra por los dos cargos en violación al Artículo 127 del Código Penal de Puerto Rico y no culpable en cuanto al cargo por la infracción al Artículo 127-A. Por tanto, le impuso a la apelante la pena concurrente de tres (3) años de cárcel bajo el régimen de sentencia suspendida y libertad a prueba.

---

[31] Transcripción de la Prueba Oral (TPO) del 18 de marzo de 2024, págs. 967-969, 975.
[32] TPO del 18 de marzo de 2024, págs. 992, 1003, 1007.

Inconforme con la *Sentencia* impuesta por el TPI, la parte apelante acude ante nosotros mediante el recurso de apelación de epígrafe, en el cual plantea los siguientes señalamientos de error:

A. Erró el Tribunal de Primera Instancia al sostener los cargos contra la oficial de la corporación que operaba el hogar cuando todos los cargos en contra de la corporación fueron desestimados.

B. Erró el Tribunal al sostener que la Sra. Morales Sierra era la principal y única responsable de la negligencia como dueña y operadora de la corporación Hogar Huellas Corporation, y en contra de las adultas incapacitadas Kimayra y Maribel, ambas de apellido Cintron Rubert, toda vez que la institución pertene[cía] y era operada por la persona jurídica Hogar Huellas Corporation.

C. Erró el Tribunal al declarar culpable a la Sra. Morales Sierra de cargos por negligencia, CP Art. 127, luego de haberse desestimado los cargos por Explotación Financiera, CP Art. 127.C Grave (2 Cargos); Apropiación Ilegal Agravada, CP Art. 182 Grave (2 Cargos); Fraude, CP Art. 202.B (2 Cargos) y Archivo de Documentos o Datos Falsos, CP Art. 216 Grave (3 Cargos).

D. Erró el Tribunal al sentenciar a la Sra. Morales Sierra por un cargo por el cual ya había sido previamente declarada no culpable, el caso EC2023G00010.

E. Erró el Tribunal de Primera Instancia al encontrar culpable a la Sra. Morales Sierra amparándose en evidencia que posdata las alegaciones en que se basan las acusaciones.

F. Erró el Tribunal de Primera Instancia al no proveerle a la Sra. Zulma Ivelisse Morales Sierra, su Debido Proceso de Ley.

El 10 de enero de 2025, el Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General, presentó su alegato. Con el beneficio de la transcripción de la prueba oral y la comparecencia de todas las partes, resolvemos.

**II.**

**A.**

Como cuestión de umbral debemos repasar la norma relacionada al quantum y peso de la prueba en los casos criminales

y aquella referente a nuestra capacidad revisora de los dictámenes de las causas penales.

Como sabemos, a todo acusado se le presume inocente hasta que su culpabilidad sea probada más allá de duda razonable. Véase, Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Por lo tanto, para derrotar esta presunción, el Ministerio Público deberá presentar prueba sobre todos los elementos del delito y su conexión con el acusado, así como la intención o negligencia criminal. Pueblo v. Resto Laureano, 206 DPR 963, 967 (2021); Pueblo v. Henríquez, Urbáez, 205 DPR 311, 323-324 (2020); Pueblo v. Acevedo Estrada, 150 DPR 84, 99 (2000). Por tanto, la carencia de prueba sobre alguno de los elementos del delito implicaría el incumplimiento por parte del Estado con su carga probatoria y supondría la absolución del acusado respecto al delito imputado. Pueblo v. Negrón Ramírez, 213 DPR 895 (2024).

Sin embargo, la prueba presentada no supone la necesidad u obligación de probar la comisión del delito con certidumbre matemática. Pueblo v. Toro Martínez, 200 DPR 834, 856 (2018). La misma deberá ser aquella que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Irizarry, 156 DPR 780, 787 (2002). Véase, además, Pueblo v. Acevedo Estrada, supra; Pueblo v. Rodríguez Román, 128 DPR 121, 131 (1991). Además, nuestro Tribunal Supremo en repetidas ocasiones ha puntualizado que la evidencia directa de un testigo que le merezca credibilidad puede ser suficiente para establecer un hecho. Pueblo v. Chévere Heredia, 139 DPR 1, 15 (1995); Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. Lo anterior, aun cuando el testimonio no sea "perfecto", toda vez que es al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables. Pueblo v. Chévere Heredia, supra, págs. 15-16.

De otra parte, la apreciación de la prueba corresponde al foro sentenciador y los tribunales apelativos sólo intervendremos con ella cuando exista error manifiesto, pasión, prejuicio o parcialidad. Pueblo v. Negrón Ramírez, supra, citando a Pueblo v. Hernández Doble, 210 DPR 850, 864 (2022); Pueblo v. Rivera Montalvo, 205 DPR 352, 373 (2020); Pueblo v. Viruet Camacho, 173 DPR 563, 584 (2008); Pueblo v. Acevedo Estrada, supra. Lo anterior cobra mayor vigencia cuando se trata de la prueba testifical desfilada en el juicio. Pueblo v. Negrón Ramírez, supra. Ello es así, debido a que son los foros de instancia los que se encuentran en mejor posición para aquilatar la prueba desfilada pues, son ellos los que tienen la oportunidad de observar y escuchar a los testigos. Pueblo v. Acevedo Estrada, supra; Pueblo v. Rosario Reyes, 138 DPR 591, 599 (1995).

Por tanto, a menos que existan las situaciones antes señaladas o que la apreciación de la prueba no encuentre cabida en la realidad fáctica, sea inherentemente imposible o increíble, este Tribunal de Apelaciones se abstendrá de intervenir con dicho ejercicio. Pueblo v. Acevedo Estrada, supra. Ahora bien, los foros apelativos pueden intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". Pueblo v. Casillas Díaz, 190 DPR 398 (2014), citando a Pueblo v. Santiago, 176 DPR 133, 148 (2009).

Un tribunal apelativo también podrá intervenir con las determinaciones de hechos y apreciación de la prueba que realice el juzgador de primera instancia si se demuestra que éste incurrió en un abuso de discreción al apreciar y adjudicar la prueba presentada ante sí. Pueblo v. Negrón Ramírez, supra, citando a Pueblo v. Rivera Montalvo, supra. En armonía con lo anterior, "un tribunal apelativo incurre también en abuso de discreción si sustituye el criterio de apreciación de la prueba realizado por el juzgador de hechos en el

foro de instancia, o las determinaciones de hechos realizadas por éste, sin haber mediado prejuicio, parcialidad, pasión o error manifiesto". Pueblo v. Negrón Ramírez, supra.

**B.**

El artículo 127 del Código Penal de 2012, 33 LPRA sec. 5186, estatuye lo relacionado al delito de negligencia en el cuidado de personas de edad avanzada e incapacitados. Este dispone, en específico, que:

> Será sancionada con pena de reclusión por un término fijo de dos (2) años, toda persona que, obrando con negligencia y teniendo la obligación que le impone la ley o el tribunal de prestar alimentos y cuidado a una persona de edad avanzada o incapacitada, ponga en peligro la vida, salud, integridad física o indemnidad sexual.
>
> **Cuando el delito sea cometido por un operador de un hogar sustituto, la persona será sancionada con pena de reclusión por un término fijo de tres (3) años**. Para efectos de este Artículo, hogar sustituto significa el hogar de una familia que, mediante paga, se dedique al cuidado diurno y en forma regular de un máximo de seis (6) personas de edad avanzada, no relacionadas con dicha familia. Si el hogar sustituto operara como una persona jurídica, de ser convicto, se impondrá pena de hasta $10,000 dólares de multa. (énfasis nuestro).

Al examinar la precitada disposición resulta evidente que los elementos del delito son: (1) actuar con negligencia; (2) tener la obligación que le impone la ley o el tribunal de prestar alimentos y cuidado a una persona de edad avanzada o incapacitada; y (3) poner en peligro la vida, salud, integridad física o indemnidad sexual de esa persona.

**III.**

En la presente causa, la apelante fue hallada culpable de cometer negligencia en el cuidado de las personas incapacitadas, Kimayra Cintrón Rubert y Maribel Cintrón Rubert. Esto tras el Ministerio Público demostrar que Morales Sierra fue negligente al no observar el cuidado debido para con las referidas adultas incapacitadas, poniendo así en riesgo la vida, salud e integridad

física de ambas, durante el período de siete (7) meses que estas permanecieron en el Hogar Huellas. Por estos hechos, el foro primario le impuso a la apelante la pena concurrente de tres (3) años de cárcel bajo el régimen de sentencia suspendida y libertad a prueba. Inconforme con dicha determinación acude ante nos y alega que el tribunal de instancia erró al emitir la *Sentencia* apelada y solicita que la revoquemos o, en la alternativa, que la modifiquemos al pago de una multa u ordenemos la celebración de un nuevo juicio.

Tras un examen detallado y desapasionado del expediente, concluimos que la sentencia en cuestión debe ser confirmada. Veamos.

En sus primeros señalamientos de error, la apelante sostiene que el foro primario incidió al sostener los cargos contra la oficial de la corporación que operaba el hogar cuando los cargos en contra de la corporación fueron desestimados. A su vez, señala que erró el foro apelado al sostener que Morales Sierra era la principal y única responsable de la negligencia, como dueña y operadora de la entidad Hogar Huellas Corporation, toda vez que la institución pertenecía y era operada por la persona jurídica Hogar Huellas Corporation.

Cónsono con ello, Morales Sierra arguye que Hogar Huellas Corporation era la entidad propietaria de la institución donde estaban las hermanas Cintrón Rubert y que ella fungía únicamente como empleada de la corporación, actuando y respondiendo a beneficio de esta. Por lo que, alega que le cobijaba la doctrina de responsabilidad vicaria, en virtud de la cual correspondía adjudicarle la responsabilidad a la corporación. Puntualiza que, conforme a lo establecido en el Art. 127 del Código Penal, la pena impuesta debió haber sido el pago de una multa de hasta diez mil dólares ($10,000.00) y no de reclusión por un término fijo de tres (3) años.

Asimismo, Morales Sierra sostiene que erró el Tribunal al declararla culpable por cargos de negligencia luego de que los demás cargos en su contra fueran desestimados. Alega que en la vista preliminar se desestimaron los cargos que pesaban en su contra por facturar por servicios no realizados y que, por tal razón, en la *Sentencia* apelada se determinó incorrectamente que no se proveyeron servicios de salud.

De entrada, es meritorio destacar que es doctrina legal reiterada que la apreciación de la prueba realizada por los foros de primera instancia debe ser objeto de respeto y deferencia. Pueblo v. Acevedo Estrada, supra. Ello debido a que, son los foros de instancia los que están en mejor posición para evaluar la prueba desfilada, pues son quienes tienen la oportunidad de observar y escuchar a los testigos. Íd.

Tras un examen detenido del expediente ante nuestra consideración y la transcripción de la prueba oral desfilada ante el foro primario y en atención a la deferencia que debemos otorgar al dictamen bien fundamentado del foro primario, no vemos que éste haya incurrido en un craso abuso de discreción, o haya mediado prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. Veamos.

Por medio de su escrito Morales Sierra pretende que determinemos que era la entidad jurídica quien respondía por sus actos y que, al ser desestimados los cargos en contra de la corporación, allí debió culminar el proceso. Sin embargo, una lectura del recurso ante nos refleja que el juzgador de instancia, en el ejercicio de su sana discreción, determinó que fue Morales Sierra y no la entidad jurídica Hogar Huellas Corporation, la responsable de no proveer los servicios de alimento y cuidados a las hermanas Maribel y Kimayra Cintrón Rubert.

Además, en su recurso, la apelante se limitó a señalar los cargos en su contra que fueron desestimados y a sostener de forma general que había provisto servicios de salud. Esto sin realizar una discusión fundamentada sobre cuáles eran específicamente los errores que entendía el foro primario había cometido en la apreciación de la prueba. De forma que, no nos puso en posición de determinar que el foro de instancia se excedió en el ejercicio de su discreción y, en consecuencia, de apartarnos de la deferencia que debemos otorgarle. Por tanto, no habremos de intervenir con la apreciación de la prueba y la adjudicación de credibilidad que realizó el foro apelado.

De otra parte, la apelante cuestiona que el foro apelado haya encontrado culpable a Morales Sierra amparándose en evidencia que posdata las alegaciones en que se basan las acusaciones y señala que erró el foro primario al no proveerle su debido proceso de ley. Sobre estos planteamientos, la apelante esboza que las adultas incapacitadas permanecieron en el hogar sustituto hasta el 16 de abril de 2021 y que, luego del egreso de la institución, estuvieron durante tres (3) días con sus padres hasta que luego Maribel fue ingresada al hospital. Por tal razón, aduce que la prueba obtenida y presentada en evidencia fue de momentos posteriores a la salida del hogar sustituto. A esos efectos, puntualiza que se violentó su debido proceso de ley. *No se cometió el error señalado.*

En el presente caso, el Ministerio Público, como parte de su deberes ministeriales en una acusación por el delito de negligencia en el cuidado de personas de edad avanzada e incapacitadas, debía presentar evidencia tendente a probar que Morales Sierra: (1) actuó con negligencia; (2) tenía la obligación que le impone la ley o el tribunal de prestar alimentos y cuidado a una persona de edad avanzada o incapacitada; y (3) puso en peligro la vida, salud,

integridad física o indemnidad sexual de esa persona. 33 LPRA sec. 5186.

A base a ello, entendemos que el foro primario no erró al permitir que se presentara evidencia sobre el estado físico y bienestar general de Kimayra y Maribel Cintrón Rubert a su salida del Hogar Huellas. Ello debido a que la referida prueba testifical y documental permitió probar la negligencia en el cuidado de ambas hermanas, al ilustrar las condiciones en que se encontraban estas tras el período de siete (7) meses que residieron en el hogar sustituto. Por ello, somos del criterio de que la prueba presentada tuvo el efecto de colocar al juzgador de instancia en una mejor posición para evaluar el asunto ante su consideración. En consecuencia, a Morales Sierra tampoco se le violentó su derecho a un debido proceso.

Por último, la apelante alega que incidió el foro primario al sentenciarla por un cargo por el cual ya había sido declarada previamente no culpable. En específico, sostiene que la juzgadora de instancia emitió sentencia declarándola no culpable en cuanto al cargo por infracción al Art. 127-A del Código Penal, en el caso E EC2023G00010 y que, posteriormente, dicha sentencia fue enmendada a los efectos de corregir el número del caso por el cual fue encontrada no culpable y declararla culpable en los casos E EC2023G00009 y E EC2023G00010.

El 16 de abril de 2024, el foro primario pronunció sentencia declarando a Morales Sierra no culpable en cuanto al cargo por la infracción al Artículo 127-A del Código Penal. Sin embargo, en el epígrafe de la referida sentencia, se incluyó el número del caso "E EC2023G00010", cuando en realidad debió expresar que se trataba del caso "E EC2023G00011". Así las cosas, el foro apelado emitió el 30 de julio de 2024 una *Sentencia enmendada* a los únicos efectos de corregir el número de caso en el epígrafe de la *Sentencia*. Por

tanto, luego de un análisis del expediente ante nuestra consideración se desprende que se trató meramente de un error de forma en cuanto al número del caso que fue subsanado ulteriormente mediante la *Sentencia enmendada* de 30 julio de 2024. Somos del criterio de que no se cometió el error señalado.

En virtud de lo antes expuesto y en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con la apreciación de la prueba realizada por la juzgadora de instancia, quien tuvo la oportunidad de escuchar y ver a los testigos declarar.[33] Los testimonios vertidos como prueba de cargo por el Ministerio Público fueron correctamente apreciados y creídos por el foro *a quo*. Así, del expediente ante nuestra consideración no surge base alguna para alterar la decisión apelada, por lo cual procede confirmar la *Sentencia* apelada.

**IV.**

Por los fundamentos antes esbozados, ***confirmamos*** la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas, contra Zulma Ivelisse Morales Sierra.

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[33] Respecto a la mejor posición en la que se encuentran los foros de instancia para apreciar y aquilatar la prueba desfilada ante sí, véase *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975).